IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

| | | |
|---|---|---|
| SEVEN NETWORKS INC. | § | |
| Vs. | § | CIVIL ACTION NO. 2:05-CV-365 |
| VISTO CORPORATION | § | |

**MEMORANDUM OPINION AND ORDER**

**1.     Introduction**

Seven Networks, Inc. ("Seven") asserts various claims of two United States patents in this case. The patents-in-suit are U.S. Patent No. 5,857,201 ("the '201 patent") and U.S. Patent No. 6,324,542 B1 ("the '542 patent"). The '542 patent is a continuation of the '201 patent. This opinion resolves the parties' various claim construction disputes. The court will address briefly the technology at issue in the case, then turn to the merits of the claim construction issues.

**2.     Background of the Technology**

The patents are directed toward client/server technology. More specifically, the inventions relate to "a client/server architecture for occasional connections between mobile computing devices and enterprise computing systems." '542 patent, col. 1, ll. 11-14. In the Background of the Invention portion of the patents, the inventors explain that in the current "persistent" connection client/server model, personal computer clients connect to a server on the network and request data on an as needed basis for a particular application. '542 patent, col. 1, ll. 16-18. The connection is described as "persistent" because it continues for the entire amount of time the application is in use.

*Id.*, ll. 20-22. Persistent connections are not possible, however, with mobile devices. Of necessity, these devices connect on an occasional basis. When they do connect, the connection needs to move the smallest amount of data in the least amount of time. This is because wireless transports are not capable of moving large amounts of data quickly, and data is very expensive to move. *Id.*, ll. 22-30.

The patents describe an architecture for use with "non-persistently" connected devices. In the '542 patent, a server computer "non-persistently" connects to a portable client device. '542 patent, col. 2, ll. 49-55. During the non-persistent connection, data may be updated on both the client device and the server computer, and the client device may perform a limited amount of interaction with the server. *Id.*, ll. 56-67. The claims of the '201 patent are somewhat similar, but they require a "gateway computer" that is persistently connected to data storage, and non-persistently connected to the client device. *See, e.g.*, '201 patent, claim 1.

The original owner of the patents was Wright Strategies, Inc. In the Abstract and in the Detailed Description of the Preferred Embodiment, the inventors describe a particular embodiment of the invention known as FormLogic, a trade name for products originally sold by Wright Strategies. Although neither the claim language nor the Summary of the Invention expressly limit the claims to the FormLogic embodiment, Visto contends that the court should construe the claims narrowly and restrict their scope to the FormLogic architecture.

**3. Discussion**

    **A. General Principles Governing Claim Construction**

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). Claim construction is an issue

of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. Under the patent law, the specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. A patent's claims must be read in view of the specification, of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's claims. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). And, although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005)(en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court

reiterated that "the *claims* of a patent define the invention to which the patentee is entitled the right to exclude." *Id.* at 1312 (emphasis added)(quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id.* The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e. as of the effective filing date of the patent application." *Id.* at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention. The patent is addressed to and intended to be read by others skilled in the particular art. *Id.*

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id.* at 1315 (quoting *Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id.* at 1314-17. As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and

> confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. The prosecution history helps to demonstrate how the inventor and the PTO understood the patent. *Phillips*, 415 F.3d at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence. That evidence is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims.

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Tex. Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Id.* at 1319-24. The approach suggested by *Tex. Digital*–the assignment of a limited role to the specification–was rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term. *Id.* at 1320-21. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of

words rather than on the meaning of the claim terms within the context of the patent." *Id*. at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id*. What is described in the claims flows from the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented. *Id.* The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word. *Id.* at 1321-22.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id*. at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

      **B.**      **Sole Embodiment Limitation**

In support of its effort to restrict the scope of the claims to the FormLogic system, Visto points to a line of Federal Circuit decisions exemplified by *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337 (Fed. Cir. 2001). In *SciMed*, the Federal Circuit considered a patent related to catheters. The issue in the case was whether the specification of the patents limited the scope of the asserted claims to catheters with coaxial lumens–the preferred embodiment. The court stated that "[w]here the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered

broad enough to encompass the feature in question." *Id*. at 1341. The court carefully reviewed the specification and observed that the patent repeatedly characterized "the invention" in terms of the coaxial lumen structure. *Id.* at 1343 (recounting statements in the Summary of the Invention and Conclusion sections of the patents). According to the court, the "most compelling portion of the specification" included a statement that "[t]he intermediate sleeve structure defined above *is the basic sleeve structure for all embodiments of the present invention contemplated and disclosed herein* . . . ." *Id.* Based on the specification, read as a whole, the court limited the scope of the claims to the sole embodiment disclosed by the patents.

This case is distinguishable from *SciMed* and the other authorities cited by Visto. In *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1326 (Fed. Cir. 2002), the defendant argued that where only one embodiment was disclosed in the specification, the claim terms should be limited to the embodiment disclosed. Rejecting this position, the court stated "our precedent establishes no such rule." *Id*. at 1326. Instead, the court repeated its prior remarks:

> Although precedent offers assorted quotations in support of differing conclusions concerning the scope of the specification, these cases must be viewed in the factual context in which they arose. Whether an invention is fairly claimed more broadly than the "preferred embodiment" in the specification is a question specific to the content of the specification, the context in which the embodiment is described, the prosecution history, and if appropriate the prior art . . . .

*Teleflex*, 299 F.3d at 1327 (*quoting Wang Laboratories v. America Online, Inc.*, 197 F.3d 1377, 1383 (Fed. Cir. 1999)).

In the present case, the claims are not limited to the embodiment described in the specification. Unlike *SciMed*, there are no statements in the specification that expressly state that the invention is limited to the FormLogic architecture. The closest statement is found in column 5

of the patent:

> Referring to Fig. 2, *a client/server system 130 of the present invention will be described. The client/server system 130 hereinafter may also be referred to as the FormLogic client/server system*.

'542 patent, col. 5, ll. 27-30 (emphasis added). The statement, however, merely reflects that "*a* client/server system 130 of the present invention is described." (emphasis added). Use of the indefinite article "a" suggests that the patentee did not intend to limit the scope of the claims to the FormLogic system. This statement, when read in light of the claim language and the rest of the specification, falls short of what is required to limit the claims to the preferred embodiment, even in cases where the patent discloses only a single embodiment.

Visto also suggests that the Abstract provides additional support. The Abstract, which provides a short description of the patented technology, refers to "[a] FormLogic (FL) client/server system and method," the "FL builder program," the "FL server" and the "FL engine." '542 patent, Abstract. *SciMed* considered statements in the Abstract to be relevant to the question of claim scope–in conjunction with the rest of the specification. *SciMed*, 242 F.3d at 1342. The Abstract in the patents-in-suit, however, describe an FL client/server system, but do not restrict "the invention" or the scope of any specific claim term to features of that embodiment. Read in conjunction with the balance of the patent, the language of the Abstract does not limit the claims to the disclosed embodiment. Accordingly, the court rejects Visto's efforts to limit the claim language to the FormLogic system described as the preferred embodiment. The court now addresses the terms in dispute.

    **C.**    **Terms in Dispute**

    **1.**    **Application program**

The term "application program" appears in claim 8 of the '201 patent. Seven argues that this term simply means "software." Visto proposes that the term means "a hardware independent program on the client created using the FormLogic Builder for performing tasks such as allowing remote database or email access." Seven's proposed definition is too broad. Not all software constitutes an application program. At the same time, Visto's proposal is too narrow, given that it is limited to the preferred embodiment. The court defines "application program" as "software that performs tasks for an end user."

    **2.**    **Client database**

The term "client database" appears in several of the claims of the patents-in-suit. Seven proposes that this term means "a collection of data stored electronically on a device." Visto seeks to construe the term to mean "a full local database on the portable client that serves as a temporary representation of a host database." Given Seven's concession at the hearing that the client database must be located physically on the client device, the court construes the term to mean "a collection of data stored electronically on the client device."

    **3.**    **Communications module**

The term "communications module" appears in both the '201 patent and in the '542 patent. Seven defines this term to mean "software on the client for communicating." Visto proposes that the term means "a software module on the client that interfaces with the gateway computer/server computer. The communications module is based on an OLE connection technology. The communications module must be on a separate device from the session module."

9

Visto's definition is replete with limitations that are not found in the claims. The cited portions of the specification related to OLE connection technology demonstrate that OLE technology is clearly illustrative and not exclusive. *See, e.g.,* '542 patent, col. 3, ll. 58-60 ("The new FormLogic client/server components described herein use an object management scheme and are *preferably* based on Microsoft's OLE technology.")(emphasis added). The court construes the term "communications module" as "software routines on the client for communicating."

### 4. Data storage

The court construes this term to mean "a device that holds data."

### 5. Directly manipulate

Several of the disputed terms relate to the manipulation of data on the client. The term "directly manipulate" appears in the '542 patent. Seven argues that the term means "causing tasks to occur, such as querying, adding, or removing data, by commands sent to the client." Visto argues that the term means "to control without any intervening agency or step."

The specification provides guidance. The patent refers to "Remote Database APIs" and states:

> These calls are used to directly manipulate the client database during a connection. When invoking Remote Database APIs from services, corresponding events will be passed back to the services that generated the call.

'542 patent, col. 8, ll. 59-62.

Seven points to this passage, as well as other portions of the specification, to argue that the proper construction of "directly manipulate" is the use of software calls or commands to perform certain actions on the client database. The court agrees with this view and holds that Visto's proposed definition does not account for the meaning of the term read in light of the specification.

Accordingly, the court defines the term "directly manipulate" to mean "causing tasks to occur, such as querying, adding, or removing data, by commands sent to the client."

### 6. Directly manipulate the associated client database

For similar reasons as those expressed with respect to the previous term, the court construes "directly manipulate the associated client database" to mean "causing tasks to occur on a client database, such as querying, adding, or removing data from that client database, by commands sent to the client."

### 7. Gateway computer

This term is used in the '201 patent. Seven proposes that the term means "an intermediate computer." Pointing to the preferred embodiment, Visto contends that the term means "a FormLogic Server located between the client and a network having the data storage." The specification and the prosecution history refer to the gateway computer as an intermediate server between the client and the original server. The court therefore construes the term "gateway computer" to mean "an intermediate server between the client and the original server."

### 8. Manipulating the client database by commands received from the gateway computer

This term appears in claim 11 of the '201 patent. Seven asks the court to incorporate its construction of "directly manipulating" into this phrase, the terms of which would require the commands to be received from the gateway computer. Visto proposes that the term means "the session module on the gateway computer directly manipulates the client database through the use of Remote Database APIs." Visto's proposed construction incorporates limitations not found in the claims. It is therefore rejected. The only phrase that needs construction is "manipulating the client

11

database by commands," and the court incorporates by reference its previous construction of "directly manipulating the client database" as the definition for that term.

### 9.     Manipulating the client database with the session module

This limitation appears in claim 28 of the '542 patent. The court concludes that "manipulating the client database" means "causing tasks to occur on the client database, such as querying, adding, or removing data, by commands sent to the client database." The balance of the phrase requires no construction. The court rejects Visto's proposed construction because it requires the use of Remote APIs and the retrieval from, and insertion of data into, the client database. The patents use the term "manipulation" more broadly than Visto proposes. In particular, manipulation is not limited to retrieving and inserting data into the client database. Moreover, requiring the use of Remote APIs would unnecessarily limit the scope of the claims to the preferred embodiment.

### 10.     Network that is further connected to the gateway computer

This term is used in the '201 patent. The court rejects both parties' proposed constructions. The court defines "network" to mean "a plurality of computers that are interconnected so they can exchange information." The balance of the phrase needs no construction.

### 11.     Non-persistent connection

Seven argues that the term means "a connection that is not full time." Visto argues that the term means "an occasional and intentionally short task oriented session defined by a connection to a remote host, the performance of a specific task or set of tasks, and then a disconnection. This is very different from a persistent connection where the intent is for the connection to persist while an application is being used." The court rejects both parties' definitions. As used in the patents, a non-persistent connection means "an occasional connection that does not exist for the entire time an

application is used." '542 patent, col. 1, ll. 24-25; col. 7, ll. 20-25.

### 12.   Persistent connection

Seven contends that this term means "a full-time connection." Visto argues that the term means "a connection that continues for the entire time an application is in use." Viewed in the context of the specification, Visto's construction is closer to correct. The court construes the term to mean "a connection that exists the entire time the application is used." '542 patent, col. 7, ll. 25-28 (describing non-persistent connection and stating that "[t]his is very different from a persistent connection based client/server model where the connection exists the entire time an application is used, and data is only retrieved when the user request it.").

### 13.   Session module

Seven contends that the term "session module" simply means "software on the server." Visto suggests that the term means "a software module on the gateway computer/server computer that controls the tasks for a communication session. The session module may not reside on the client." As the proposals reflect, the parties agree that the session module must reside on the server computer. They disagree, however, on the functionality of the module and, in particular, that the module must "control" the tasks for a communication session.

The specification describes one aspect of the invention as "a server computer, comprising a server data source, a session module, in communication with the server data source, to non-persistently connect to the communications module and access the client database from time to time." '542 patent, col. 2, ll. 52-55. One limitation of claim 1 of the '542 patent reads similarly, requiring "a session module, in communication with the data storage, to non-persistently connect to the communications module and directly manipulate the client database during the connection from

13

time to time." '542 patent, claim 1. From these passages, it does not appear that the claims require the session module to "control the tasks for a communication session." Instead, the claim language describes the functionality required by the routines. *Compare* '542 patent, claim 1 ("a session module . . to non-persistently connect . . . and directly manipulate") *with* claim 22 ("plurality of session modules executing on the server computer, each session module in data communication with the other session modules, wherein one of the plurality of session modules non-persistently connects to at least one of the plurality of portable client devices."). The court accordingly construes the term "session module" as "a group of software routines located on the server." The balance of the claim language defines the functionality required by the module.

### 14.     Server computer

This term is used throughout the '542 patent claims. Seven contends that the term means "a machine on a network that provides a particular service to other machines." Visto argues that the term means "the FormLogic Server responsible for directly manipulating the client database, including retrieving data and inserting new data." Visto's construction would limit the claims to the preferred embodiment and is rejected. The court construes the term "server computer" to mean "a machine on a network that provides a particular service to other machines."

### 15.     Synchronization

The parties dispute what is meant by the term "synchronization." Seven's proposed construction is "updating the client and server databases to reflect changes that have happened since the last connection." Visto's construction is "merging data from the client database with the data from the data store." In the context of these claims, "synchronization" means "updating the client and server databases to reflect changes that have happened since the last connection."

      **16.**      **Allowing access to the client database**

The court agrees with Seven that this term, as used in the '201 patent, needs no construction.

      **17.**      **Local area network**

Again, Seven argues that this term needs no construction. Visto urges that it means "a network that connects several computers that are located nearby to one another, allowing them to share devices and files." Although Seven does not dispute that a LAN requires several computers to be located in close proximity, Seven disputes that the computers on the LAN must necessarily share devices and files. The court has previously construed the term "network" to mean a plurality of computers that are interconnected so they can exchange information. A "local area network" is therefore defined as "a plurality of computers located nearby to one another that are interconnected so they can exchange information."

      **18.**      **Local area network that is further connected to the server**

This term needs no construction.

      **19.**      **Query/Querying**

The court defines "query" to mean "a request for information."

      **20.**      **Data communication with one or more of the plurality of data storages that may be different than the one or more of the plurality of data storages in communication with the other session modules**

The court concludes that this phrase requires no additional construction other than those previously provided for "data storage" and "session module."

**4.**      **Conclusion**

The court adopts the above definitions for those terms in need of construction. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions

in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the court.

SIGNED this 29th day of December, 2006.

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE